STATE OF NORTH CAROLINA

COUNTY OF CHATHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

**FILED**

2023 JAN 26 P 2: 06

CHATHAM CO. C.S.C.

TOWN OF PITTSBORO,

Plaintiff,

v.

3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; NATIONAL FOAM, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CLARIANT CORPORATION; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; and JOHN DOE DEFENDANTS 1-50,

Defendants.

Case No. 23 CVS 70

**ORIGINAL COMPLAINT**

(1) PRODUCTS LIABILITY (DESIGN DEFECT);

(2) PRODUCTS LIABILITY (FAILURE TO WARN);

(3) PUBLIC NUISANCE;

(4) PRIVATE NUISANCE;

(5) TRESPASS;

(6) NEGLIGENCE

**JURY TRIAL DEMANDED**

Plaintiff, the TOWN OF PITTSBORO ("Plaintiff" or the "Town"), by and through its undersigned counsel, brings this action against Defendants 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CHEMGUARD, INC.; TYCO FIRE PRODUCTS LP (successor-in-interest to The Ansul Company); KIDDE-FENWAL, INC.; KIDDE PLC, INC.; CHUBB FIRE, LTD.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CARRIER GLOBAL CORPORATION; NATIONAL FOAM, INC.;

1

BUCKEYE FIRE EQUIPMENT COMPANY; ARKEMA, INC.; BASF CORPORATION; CLARIANT CORPORATION; AGC, INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS, INC.; DYNAX CORPORATION; ARCHROMA MANAGEMENT, LLC; ARCHROMA U.S., INC.; and JOHN DOE DEFENDANTS 1–50 (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION AND SUMMARY

1.  The Town brings this action against Defendants for contamination of the Town's property and water supply with toxic per- and poly-fluoroalkyl substances ("PFAS").

2.  PFAS are a class of synthetic chemicals that do not occur naturally in the environment and have been in use since the 1940s.

3.  PFAS are commonly referred to as "forever" chemicals because they are nearly indestructible, taking hundreds—or even thousands—of years to degrade naturally in the environment.

4.  PFAS are also toxic at very low levels—i.e., in the parts per quadrillion. Exposure to these human-made chemicals has been linked to a wide array of adverse human health effects, including cancer, and considered particularly dangerous to pregnant women and young children.

5.  Defendants in this action are chemical companies that designed, manufactured, marketed, promoted, sold, supplied, distributed, used, and/or disposed of PFAS, products containing PFAS, and/or products that degrade into PFAS after release to the environment (collectively, "PFAS Products"), including but not limited to aqueous film-forming foam ("AFFF").

6.  For decades, Defendants knew or should have known that PFAS are highly soluble in water; extremely mobile, persistent, and very likely to contaminate the environment, including

2

surface water and groundwater, and including the Town's drinking water supply. Defendants also knew or should have known that PFAS present significant risks to human health and welfare if released to the environment. Nonetheless, they continued manufacturing, distributing, and selling large volumes of PFAS Products to industrial facilities and consumers in the Haw River watershed, knowing that the ordinary use and disposal of those products would result in significant PFAS contamination of the Haw River watershed, the Haw River, the Town, the Town's property including its drinking water system, and natural resources in the Town.

7.      Moreover, rather than warning of these risks and harms, Defendants concealed the dangers of PFAS from consumers, the public, and the Town. Even as their own research showed that the normal use and disposal of PFAS Products would contaminate the environment and create risks to public health, Defendants publicly denied, downplayed, and distorted the risks posed by PFAS.

8.      By marketing, promoting, selling, supplying, and distributing large volumes of PFAS Products to industrial facilities and other consumers in the Haw River watershed, while simultaneously concealing and misrepresenting the human health and environmental risks posed by those products, Defendants caused contamination across the Haw River watershed, including at and upstream of the Town. This contamination has injured—and continues to injure—public health, natural resources, property, and the economic well-being of the Town and its citizens.

9.      The Town draws drinking water from the Haw River, a major tributary of the Cape Fear River. The Haw River watershed encompasses all or part of eight counties—mostly upstream of Pittsboro—that have had widespread industrial activity.

3

10.     The Town uses a run-of-river intake to draw water from the Haw River. The Town processes Haw River water using a conventional water treatment facility. The processed water is then distributed to Town residents.

11.     There are many cities and towns upstream of Pittsboro in the Haw River watershed that discharge treated wastewater into the Haw River or its tributaries. At times, treatment plant effluent constitutes over 50 percent of the Haw River's flow.

12.     PFAS have been detected at high levels in the effluent of wastewater treatment facilities that discharge into the Haw River upriver of Pittsboro.

13.     Sampling has indicated that the Town's drinking water supply is contaminated with PFAS. The Town's intake on the Haw River is contaminated from a combination of sources that discharge into the Haw River via runoff, groundwater flow, and direct discharge. Major likely and known sources of contamination include industrial operations, wastewater treatment facility effluent and sludge, landfills, sludge or septage spreading, and users of AFFF.

14.     PFAS have been used to manufacture AFFF. AFFF has been commonly used as a firefighting agent in airport and other firefighting facilities upstream of the Town in the Haw River watershed, including the Piedmont Triad International Airport near Greensboro. Releases at such firefighting facilities have contributed to PFAS contamination of the Haw River upstream of the Town's drinking water intake.

15.     In June 2022, the EPA updated its interim health advisory levels for PFOA and PFOS because of new research demonstrating the chemicals' exceptional dangers. The new interim levels recommend PFOA concentrations in drinking water below 0.004 ppt, and PFOS concentrations in drinking water below 0.02 ppt. PFOA and PFOS have been detected in the Town's drinking water in concentrations exceeding the new EPA health advisory levels.

4

16.     In addition to PFOA and PFOS sampling, the Town's water supply has been sampled for total PFAS concentrations. Total PFAS concentrations in the Town's water supply have been sampled at levels that are among the highest in the state.

17.     As a result of the Town's ongoing investigatory efforts and newly available data about PFAS contamination generally, the Town has become aware of the levels of PFAS in its drinking water system that could affect public health. The Town has identified multiple contaminated sites and numerous locations where PFAS are known or suspected to have been discharged into the environment. Based on current information, PFAS contamination is widespread in the Haw River watershed upstream of the Town.

18.     The Town is taking and will take necessary actions to protect its residents and water resources from harm caused by PFAS. This includes investigating and monitoring PFAS, taking actions to abate, contain, treat, and/or remove PFAS contamination in the Town and in its water supply, and educating Town water users about PFAS. The Town established the Pittsboro Water Quality Task Force to respond to PFAS. The Town has also engaged consultants to evaluate water treatment options. The Town has installed a granular activated carbon filter system in its water system.

19.     This PFAS contamination, which is caused by Defendants' wrongful, deceptive, and tortious conduct, has been and will be expensive for the Town and its taxpayers, and has and will result in increased costs for the Town and its taxpayers.

20.     The Town therefore files this lawsuit to ensure that those who profited from the production, promotion, and sale of PFAS Products also bear the costs stemming from the ordinary and foreseeable handling and use of those products. The Town asserts claims in its capacity as a public entity that provides water and owns property.

5

21.     The Town seeks to recover all costs, expenses, and damages associated with Defendants' tortious conduct, including—but not limited to—restoration and loss-of-use damages, natural resource damages, and the costs of investigating, abating, containing, preventing, treating, removing, and remediating PFAS contamination in the Town, its drinking water system, and its water supply, including but not limited to disposal costs associated with these efforts. The Town requests punitive damages to reflect Defendants' willful, wanton, and/or malicious conduct. The Town also seeks equitable relief to abate the public nuisance consisting of PFAS contamination in the Town and its water supply, including but not limited to contamination of the segments of the Haw River that run adjacent to and upstream of the Town.

## PARTIES

22.     Plaintiff Town of Pittsboro is a political subdivision of the State of North Carolina. It is located in Chatham County by the Haw River.

23.     The Town consists of several offices, departments, and divisions, each with purview over Town operations, facilities, properties, and programs that have been injured by Defendants' conduct as alleged herein.

24.     All Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the PFAS Products that have and continue to contaminate Plaintiff's property and water supply.

25.     **Defendant 3M Company ("3M")** is a Delaware corporation authorized to conduct business in North Carolina, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144.

6

26.     At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in North Carolina and in and around the Haw River watershed.

27.     3M is the only company that manufactured and/or sold PFOS in the United States, including in North Carolina.

28.     3M has sold and/or distributed AFFF products for decades in North Carolina, including but not limited to fire departments, military installation and training facilities, and airports in at least the following locations in North Carolina: Mecklenburg County, Onslow County, Stanly County, Wayne County, and the Haw River watershed.

29.     **Defendant E. I. DuPont de Nemours and Company ("Historical DuPont") is a** Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805. DuPont is registered to do business in North Carolina.

30.     At all times relevant, Historical DuPont manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in North Carolina and in and around the Haw River watershed.

31.     For more than five decades, Historical DuPont manufactured, produced, or utilized PFOA and other PFAS at plants in New Jersey and West Virginia, and at Fayetteville Works in North Carolina.

32.     Historical DuPont processed, manufactured, and/or sold its PFAS Products to various AFFF and other chemical companies for decades.

33.     Historical DuPont also processed, manufactured, and/or sold its PFAS Products for use in AFFF—to Kidde Fire Fighting, Inc. and subsequently to National Foam from the early 2000s until recently.

7

34. **Defendant The Chemours Company** is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899. Chemours is registered to do business in North Carolina.

35. The Chemours Company was incorporated as a wholly owned subsidiary of Historical DuPont on or around April 30, 2015. In July 2015, Historical DuPont spun off The Chemours Company into a separate, publicly traded company. As part of this spin-off, Historical DuPont transferred to The Chemours Company Historical DuPont's performance-chemicals business line, which includes Historical DuPont's fluoroproducts business, and 37 active chemical plants, which included Fayetteville Works. Historical DuPont also distributed shares of The Chemours Company to Historical DuPont stockholders.

36. The Chemours Company sold and/or distributed its PFAS Products to Kidde Fire Fighting, Inc. and then subsequently National Foam for decades.

37. Chemours has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

38. **Defendant The Chemours Company FC, LLC** ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street, Wilmington, Delaware, 19899. Chemours FC is registered to do business in North Carolina.

39. Chemours FC operates as a wholly owned subsidiary of The Chemours Company, and manufactures fluoropolymer resins.

8

40. At all times relevant, Chemours FC manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in North Carolina. Chemours FC has operated the Fayetteville Works, a known source of PFAS contamination.

41. This Complaint refers collectively to The Chemours Company and Chemours FC, LLC as "Chemours."

42. **Defendant Chemguard, Inc.** ("Chemguard") is a Texas corporation with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard is a subsidiary of Johnson Controls International plc.

43. At all relevant times, Chemguard conducted business throughout the United States, including in North Carolina.

44. Chemguard manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS and that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

45. **Defendant Tyco Fire Products LP** ("Tyco") is a Delaware limited partnership with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. Tyco acquired Chemguard in 2011. Tyco is registered to do business in North Carolina.

46. Tyco is the successor-in-interest to The Ansul Company ("Ansul"). Tyco is an indirect subsidiary that is ultimately owned wholly by Johnson Controls International plc, an Irish public limited company listed on the New York Stock Exchange. This Complaint collectively refers to Tyco and Ansul as "Tyco/Ansul."

47. At all relevant times, Tyco/Ansul conducted business throughout the United States, including in North Carolina.

9

48. Tyco/Ansul has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

49. **Defendant Kidde-Fenwal, Inc.** ("Kidde") is a Delaware corporation with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde was part of UTC Fire & Security Americas Corporation, Inc. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc., f/k/a National Foam System, Inc.) (collectively, "Kidde Fire").

50. At all relevant times, Kidde Fire conducted business throughout the United States, including in North Carolina.

51. Kidde Fire has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

52. **Defendant Kidde PLC, Inc.** ("Kidde PLC") is a Delaware corporation with its principal place of business located at 9 Farm Springs Road, Farmington, Connecticut 06032. Kidde PLC, Inc. was part of UTC Fire & Security Americas Corporation, Inc.

53. At all relevant times, Kidde PLC, Inc. conducted business throughout the United States, including in North Carolina.

54. Kidde PLC manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in North Carolina.

10

55.     **Defendant Chubb Fire, Ltd.** ("Chubb") is a foreign private limited company, United Kingdom registration number 134210, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to Chubb Fire & Security Ltd.; Chubb Security, PLC; Red Hawk Fire & Security, LLC; and Chubb National Foam, Inc. Chubb was part of UTC Fire & Security Americas Corporation, Inc.

56.     Chubb manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in North Carolina.

57.     **Defendant UTC Fire & Security Americas Corporation, Inc.** ("UTC") was a Delaware corporation with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. UTC was a division of United Technologies Corporation. UTC's successor, Carrier Fire & Security Americas Corporation, is registered to do business in North Carolina.

58.     UTC manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in North Carolina.

59.     **Defendant Carrier Global Corporation** ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Carrier Fire & Security Americas Corporation is registered to do business in North Carolina under the same address as Carrier.

60.     On or around April 3, 2020, UTC completed the spin-off of one of its reportable segments into Carrier, a separate publicly traded company. Carrier's operations are classified into three segments: HVAC, Refrigeration, and Fire & Security.

11

61.     At all relevant times, Carrier conducted business throughout the United States, including in North Carolina. Carrier has operations in Mebane, North Carolina.

62.     Carrier's Fire & Security products and services are sold under brand names including Chubb and Kidde.

63.     Carrier manufactured, marketed, promoted, distributed, and/or sold AFFF that contained PFAS throughout the United States, including in North Carolina.

64.     **Defendant National Foam, Inc.** ("National Foam") is a Delaware corporation with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501. National Foam is a subsidiary of Angus International Safety Group, Ltd. National Foam manufactures the Angus brand of AFFF products. National Foam is registered to do business in North Carolina.

65.     National Foam has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

66.     **Defendant Buckeye Fire Equipment Company** ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086.

67.     At all relevant times, Buckeye conducted business throughout the United States, including North Carolina.

68.     Buckeye has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

12

69.     **Defendant Arkema, Inc.** ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema is registered to do business in North Carolina.

70.     Arkema has designed, manufactured, marketed, and sold AFFF containing PFAS and/or its precursors that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including the Haw River watershed.

71.     **Defendant BASF Corporation** ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. BASF is the successor-in-interest of Ciba Holding, Inc., Ciba Corporation, Ciba Specialty Chemicals, and Ciba Geigy Corporation (collectively "Ciba"). BASF is registered to do business in North Carolina.

72.     Ciba and BASF manufactured, marketed, promoted, distributed, and/or sold PFAS Products throughout the United States, including in North Carolina.

73.     **Defendant Clariant Corporation** ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205. Clariant is a subsidiary of Clariant Ltd, a Swiss company with headquarters in Muttenz, Switzerland, and with subsidiaries throughout the United States. Clariant was formed in 1995, via a name change from Sandoz Chemical Corporation, and in 1997, it acquired AFFF-related assets of Hoechst Specialty Chemicals. This Defendant manufactured PFAS Products for use in AFFF. Clariant is registered to do business in North Carolina.

74.     Clariant has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA and/or its precursors used to manufacture AFFF that was transported, stored,

used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

75.    **Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC")** is a corporation organized under the laws of Japan and doing business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405, Japan.

76.    AGC and/or its affiliates have designed, manufactured, marketed, and sold fluorosurfactants containing PFOA, and/or their precursors used to manufacture AFFF that was transported, stored, handled, used, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

77.    **Defendant AGC Chemicals Americas, Inc. ("AGC Americas")** is a Delaware corporation with its principal place of business at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. AGC Americas is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd. AGC Americas is registered to do business in North Carolina.

78.    AGC Americas and/or its affiliates have designed, manufactured, marketed, and sold fluorosurfactants containing PFOA, and/or their precursors used to manufacture AFFF, that was transported, stored, handled, used, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

79.    **Defendant Dynax Corporation ("Dynax")** is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. This Defendant manufactured PFAS Products for use in AFFF.

80.    At all relevant times, Dynax conducted business throughout the United States, including North Carolina.

14

81. Since its founding in 1991, Dynax has been a leading producer of specialized fluorochemicals and a primary fluorosurfactant provider for at least 3M and National Foam within the relevant time period. The fluorosurfactant provided by Dynax is used to make AFFF.

82. Dynax has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA, and/or its precursors used to manufacture AFFF, that was transported, stored, used, handled, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

83. **Defendant Archroma Management, LLC** ("Archroma") is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

84. **Defendant Archroma U.S., Inc.** ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Drive, #10, Charlotte, North Carolina 28217.

85. Archroma U.S. is a successor to Clariant Corporation, which manufactured fluorochemicals used in AFFF and was formerly known as Sandoz Chemicals Corporation and as Sodeyeco, Inc..

86. Archroma U.S. is a subsidiary of Archroma Management, LLC, and supplied PFAS Products for use in AFFF.

87. Archroma U.S. is registered to do business in North Carolina.

88. Archroma U.S. has designed, manufactured, marketed, and sold fluorosurfactants containing PFOA, and/or its precursors used to manufacture AFFF, that was transported, stored, handled, used, trained with, used to test equipment with, released, spilled, otherwise discharged, and/or disposed in North Carolina, including in the Haw River watershed.

15

89.     **Defendants John Doe 1-50** ("Doe Defendants") are unidentified and fictitious entities or persons whose names are presently unknown and whose actions, activities, omissions (a) may have caused or contributed to the PFAS contamination of the Haw River watershed, the Town's natural resources, and its property; (b) may be vicariously responsible for entities or persons who caused or contributed to the contamination of the Haw River watershed, the Town's natural resources, and its property; or (c) may be successors-in-interest to entities or persons who caused or contributed to the contamination of the Haw River watershed, the Town's natural resources, and its property. After a reasonable search and investigation to ascertain the Doe Defendants' actual names, the Doe Defendants' actual identities are unknown to the Town because they are not linked with any of the Defendants on any public source.

90.     Doe Defendants 1-50, either in their own capacity or through another party, are liable for designing, manufacturing, marketing, promoting, distributing, selling, using, and/or disposing of PFAS Products in ways that caused PFAS contamination of property and natural resources in the Town—all while knowing to a substantial certainty that such contamination would occur.

91.     All Defendants and/or their predecessors in liability: (a) designed, marketed, developed, distributed, sold, manufactured, released, supplied, transported, arranged for disposal or treatment of, handled, and/or used PFAS Products in the Haw River watershed such that those PFAS Products have contaminated and threatened the Town's natural resources and property; (b) acted with actual or constructive knowledge that those PFAS Products would be delivered into areas affecting the Town's natural resources and property; and (c) affirmatively promoted PFAS Products for uses that they knew or should have known would result in the contamination of the Town's natural resources and property, despite the availability of reasonable alternatives.

16

92. When this Complaint references any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

93. All references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

94. When the term "Defendants" is used alone, it refers to all Defendants named in this Complaint jointly and severally.

## JURISDICTION

95. The Superior Court has jurisdiction over this action pursuant to N.C.G.S. § 7A-243 because the amount in controversy exceeds twenty-five thousand dollars ($25,000).

96. This Court has personal jurisdiction over Defendants pursuant to N.C.G.S. § 1-75.4 because all Defendants are domestic corporations; are engaged in substantial activity within North Carolina; are responsible for acts or omissions within North Carolina giving rise to this action; are responsible for acts or omissions outside North Carolina giving rise to the Town's injuries within North Carolina; carried on solicitation or services activities within North Carolina; serviced or manufactured products, materials, or things that were used or consumed within North Carolina in the ordinary course of trade; or some combination of the foregoing; and/or because this action concerns services, goods, contracts, and/or property within North Carolina. The exercise of personal jurisdiction over Defendants complies with the U.S. Constitution because each Defendant is incorporated in the State of North Carolina, has its principal place of business in the State of

17

North Carolina, has serviced a market for its products in North Carolina, or has taken actions giving rise to the Town's injuries in the State of North Carolina.

## VENUE

97.     Under N.C.G.S. §§ 1-76, 1-77, 1-80, and/or 1-82, venue is proper in Chatham County, North Carolina, because the Town is located in Chatham County, because the causes of action, or some part thereof, arose in Chatham County, and/or because the Town's real property in Chatham County has suffered, and continues to suffer, injuries as a result of Defendants' conduct.

## FACTUAL ALLEGATIONS

### A. PFAS

98.     PFAS are a family of chemical compounds containing fluorine and carbon atoms.

99.     For purposes of this Complaint, the term "PFAS" includes, but is not limited to, the following substances (including the chemicals themselves, as well as all of their salts, ionic states, acid forms of molecules, and "precursor" chemicals) and any other PFAS chemicals regulated by the U.S. EPA and/or the State of North Carolina in the future:[1]

> a. **Perfluorooctanoic acid ("PFOA")** (Fluorinated Carbon Chain Length: C8) (Chemical Abstract Services Registry Number ("CASRN"): 335-67-1);
> b. **Perfluorooctanesulfonic acid ("PFOS")** (Fluorinated Carbon Chain Length: C8) (CASRN: 1763-23-1);
> c. **Perfluorononanoic acid ("PFNA")** (Fluorinated Carbon Chain Length: C9) (CASRN: 375-95-1);
> d. **Perfluorohexanoic acid ("PFHxA")** (Fluorinated Carbon Chain Length: C6) (CASRN: 307-24-4);

---

[1] *See* North Carolina Department of Environmental Quality, *Managing Emerging Compounds in Water* (June 2022), https://deq.nc.gov/news/key-issues/emerging-compounds/managing-emerging-compounds-water#groundwater-and-surface-water-quality-standards-actions; U.S. Environmental Protection Agency, *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections* (June 15, 2022), https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan.

18

e. **Perfluorohexanesulfonic acid ("PFHxS")** (Fluorinated Carbon Chain Length: C6) (CASRN: 355-46-4);

f. **Perfluorobutanesulfonic acid ("PFBS")** (Fluorinated Carbon Chain Length: C4) (CASRN: 375-73-5); and

g. **Perfluoroheptanoic acid ("PFHpA")** (Fluorinated Carbon Chain Length: C7) (CASRN: 375-85-9).

100. There are more than 6,000 different types of PFAS. The list contained in the above paragraph is not a complete list of PFAS that are the subject of this Complaint or that the Town may ultimately seek recovery for. The Town reserves its right to identify additional PFAS as instrumentalities of the Town's injuries in this litigation through discovery and as the science and research on PFAS develops.

101. PFAS are human-made, synthetic chemicals that do not exist naturally in the environment.

102. PFAS have been used for decades in a wide array of consumer and industrial products. PFAS are used in the production of many consumer products, including non-stick cookware, food packaging, stain resistant carpet and furniture, water resistant clothing, personal care products, and firefighting foam.

103. PFAS enter the environment from industrial facilities that manufacture PFAS Products. Industries that are known sources of PFAS releases to the environment include textile and leather processing, paper mills, metal finishers, wire manufacturers, plating facilities, and manufacturers and facilities using fluorosurfactants, resins, molds, plastics, photolithography, and semiconductors. PFAS releases at industrial sites are generally due to direct wastewater discharge, as well as accidental releases such as leaks or spills.

104. PFAS also enter the environment through the normal use and disposal of PFAS Products. Landfills receive industrial waste, sewage sludge, waste from site mitigation, and PFAS-bearing consumer or household waste. PFAS in landfills and former landfills can leach from these

19

wastes into groundwater and surface water. PFAS may also be released from landfills in fugitive dust or directly to the atmosphere. Landfills constructed before 1990 that received industrial and construction waste deposits have a higher potential for contributing to PFAS releases because they were not required to be constructed with flexible membrane liners or other leachate control measures. Nationwide studies in the United States, as well as Canada and Europe, have shown high levels of PFAS in landfill leachate.

105.    Municipal and industrial wastewater treatment plants also receive waste from industrial and consumer items containing PFAS. These facilities provide multiple pathways for PFAS from these sources to contaminate groundwater and surface water, including by point source discharges of effluent, leakage or unintended releases from sewerage or surface impoundments, air emissions, or disposal of biosolids or other byproducts generated during the treatment process.

106.    PFAS have unique characteristics that cause extensive and enduring environmental contamination. These synthetic chemicals are very mobile. PFAS can migrate long distances because they are highly soluble, meaning that they readily transport through soil, surface water, and groundwater. PFAS are also persistent—i.e., they do not readily biodegrade or chemically degrade in the environment or in conventional treatment systems. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land or into water, those compounds migrate through the environment and into groundwater, surface water, fish, wildlife, and other natural resources; resist natural degradation; and are difficult and costly to remove from the environment.

107.    Humans are exposed to PFAS through ingestion of drinking water and contaminated food, inhalation, dermal contact, and other pathways. PFAS bioaccumulate in the human body and can bio-magnify in other organisms, particularly fish and mammals higher up in

the food chain. PFAS can even be found in the blood of human infants, and protein-rich breast milk appears to be a source of PFAS exposure.

108.    PFAS contamination presents a significant threat to public health, property, and the environment.

109.    Even low doses of PFAS can result in adverse health effects for humans and animals. Those effects include but are not limited to:

- Liver damage;

- Altered cholesterol levels;

- Pregnancy-induced hypertension and/or preeclampsia;

- Thyroid disease;

- Dysregulation of the immune system;

- Increased risk of certain cancers;

- Increased risk of ulcerative colitis;

- Decreased fertility; and

- Decreases in birth weight.

110.    Because PFAS persist in the environment, these chemicals will remain within the Town and continue to contaminate natural resources and property indefinitely, unless and until PFAS are actively treated, removed, or otherwise cleaned up from the environment.

## B. AQUEOUS FILM-FORMING FOAM

111.    AFFF is a source of PFAS contamination in the Town and its water supply. AFFF is a fire-suppressing foam first developed in the 1960s to extinguish flammable liquid fires. For decades, PFAS have been used to manufacture AFFF. Firefighters apply AFFF by spraying the

21

foam solution directly onto the fire, where it can then freely seep into surrounding soil and groundwater, and runoff into surface water.

112. PFAS-containing AFFF has routinely been used in thousands of fire training exercises at military installations, civilian airports, local fire departments, and industrial facilities throughout the United States, including in the Haw River Watershed. A single firefighting training event can discharge thousands of gallons of PFAS-containing AFFF foam solution into the natural environment. Fire departments in the Haw River Watershed have inventories of AFFF manufactured by at least the following defendants: 3M, Chemguard, National Foam, and Tyco/Ansul.

113. These operations and training exercises involve the use, reuse, and flushing of equipment containing and contaminated with AFFF.

114. Defendants were aware that firefighting and training exercises exposed firefighters directly and the public indirectly by the ordinary and foreseeable use of their products. Defendants foresaw, or reasonably should have foreseen, that such exposure would naturally result from the ordinary use of AFFF because the AFFF designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFAS.

## C. DEFENDANTS DESIGNED, MANUFACTURED, PROMOTED, SOLD, USED, AND/OR DISPOSED OF PFAS PRODUCTS THROUGHOUT THE UNITED STATES, INCLUDING IN THE STATE OF NORTH CAROLINA AND THE HAW RIVER WATERSHED.

115. PFAS were first developed in the late 1930s to 1940s and put into large-scale manufacture and use by the early 1950s.

116. Beginning in the 1940s, 3M produced PFAS by electrochemical fluorination. This process results in a product that contains or breaks down into compounds containing PFOS, PFOA, PFNA, and/or PFHxS. 3M went on to market several PFOA and PFOS Products, including its

22

Scotchgard brand of stain repellant, food packaging, textile treatments, and fluorosurfactants and additives, among many others.

117.    From the 1940s through the early 2000s, 3M was the primary manufacturer of PFAS in the United States. 3M was the only known domestic manufacturer of PFOS and PFHxS. 3M was also a major manufacturer of PFOA.

118.    3M manufactured PFAS as raw chemical materials for use in 3M products and products made by third parties. 3M marketed and sold PFAS Products, including PFAS-containing AFFF, throughout the United States.

119.    In response to pressure from the EPA, 3M began phasing out production of PFOS in the early 2000s.

120.    In or around 1951, DuPont began to produce and sell polytetrafluoroethylene ("PTFE"), a fluoropolymer. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e., a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water, and oil; a lubricant; a coating for catheters and other medical equipment; and an oxidizer in flares—among many other uses.

121.    DuPont produced numerous other PFAS Products, and it marketed and sold PFAS Products throughout the United States.

122.    DuPont also began producing PFOA for its own use and for sale in the early 2000s, after 3M ceased PFOA production. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

23

123.    3M and DuPont were the only companies to manufacture PFOA in the United States.

124.    The remaining Defendants designed, manufactured, marketed, sold, and/or distributed large quantities of PFAS-containing AFFF and/or other PFAS Products, including in and around the Haw River watershed.

125.    By at least the 1970s, National Foam, Tyco/Ansul, and BASF/Ciba started manufacturing, marketing, and/or selling PFAS-containing AFFF.

126.    Chemguard started to manufacture, market, and/or sell PFAS-containing AFFF as early as the 1990s.

127.    Since its founding in 1991, Dynax has been a leading producer of specialized fluorochemicals and a primary fluorosurfactant provider for at least 3M and National Foam within the relevant time period. Dynax has manufactured, marketed, and/or sold AFFF that contained PFAS.

128.    Starting in the late 1990s, Clariant manufactured, marketed, and/or sold AFFF that contained PFAS.

129.    In the 2000s, Buckeye and Kidde began manufacturing, marketing, and/or selling PFAS-containing AFFF.

130.    At least by 2013, Archroma U.S. manufactured, marketed, and/or sold PFAS-containing AFFF.

131.    All Defendants designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in such a way as to cause harm to natural resources, property, and human health.

24

## D. DEFENDANTS KNEW OF THE DANGERS POSED BY THEIR PFAS PRODUCTS.

### 1. 3M

132. More than half a century ago, 3M knew of the health hazards and environmental risks posed by PFAS.

133. As early as the 1950s, 3M began testing the physiological and toxicological properties of PFAS. Based on these internal studies, 3M knew that PFAS were toxic to humans and the environment.

134. In the 1950s, 3M also knew that PFAS had the ability to move throughout groundwater, and that PFAS bioaccumulate in humans and animals.

135. As early as 1960, 3M knew that PFAS were capable of leaching into groundwater and contaminating the environment. Indeed, an internal memo from that year described 3M's understanding that chemical waste from 3M's PFAS manufacturing would "eventually reach the water table and pollute domestic wells."

136. By at least the 1960s, 3M knew that some PFAS do not naturally degrade in the environment. One 1963 report by 3M described PFAS as being stable in the environment, "completely resistant to biological attack," and "toxic." At around the same time, 3M also tested for PFAS in well waters and confirmed the presence of surfactant pollution in wells.

137. As early as 1970, 3M knew that its PFAS Products were hazardous to marine life. 3M researchers also documented PFOA and PFOS in fish.

138. In the 1970s, 3M began monitoring the blood of its employees for PFAS because it was concerned about the health effects of PFAS exposure. This research confirmed that PFAS bioaccumulate in humans. Indeed, at a 3M PFAS-manufacturing plant in Cottage Grove, Minnesota, workers had levels of fluorochemicals in their blood that were "1,000 times normal."

25

139. In 1975, 3M found that there was a "universal presence" of PFOA in blood serum samples taken across the United States. Since PFOA is not naturally occurring, this finding should have alerted 3M to the likelihood that its products were a source of this PFOA—a possibility that 3M considered internally but did not share outside the company. This finding also should have alerted 3M to the likelihood that PFOA is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics would explain the ubiquitous presence of PFOA in blood.

140. During the late 1970s, 3M continued to research and confirm the dangers of PFAS. In a 1978 animal study conducted by 3M, the company concluded that PFAS "should be regarded as toxic" and "urgently recommended that all reasonable steps be taken immediately to reduce exposure of employees to these compounds." In 1979, another 3M report concerning PFAS toxicity stated that the synthetic compounds were "more toxic than anticipated" and recommended that "lifetime rodent studies . . . be undertaken as soon as possible." Despite these warnings and recommendations, 3M decided to not publish the findings of this investigation.

141. A 1979 memo from M.T. Case, formerly within 3M's medical department in Corporate Toxicology and Regulatory Services, stated that he believed it "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long-term chronic exposure."

142. At a 1979 meeting among 3M employees about the "Fluorochemicals in Blood Program," an outside researcher named Dr. H.C. Hodge noted that "[r]eduction in exposure [to 3M employees to fluorochemicals] should have a top priority" and recommended that further testing be conducted. According to Dr. Hodge, "[i]t should be determined if FC-807 [a PFAS

26

chemical] or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

143.    In the late 1970s, 3M also continued to study the fate and transport characteristics of PFAS in the environment, including in surface water and biota. A 1979 report drew a direct line between effluent from a 3M plant in Decatur, Alabama, and PFAS bioaccumulating in fish tissue taken from the Tennessee River. At around the same time, an internal report from 3M warned that PFOA and PFOS "are likely to persist in the environment for extended periods" and that one PFAS compound was "completely resistant to biodegradation."

144.    In 1981, 3M moved 25 female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure." This was based on internal research showing that PFAS compounds were causing birth defects in rats. Yet 3M did not alert the public or regulatory agencies of its concerns with effects of exposure to PFAS.

145.    In 1983, 3M scientists concluded that concerns about PFAS "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of [PFAS] in the environment."

146.    3M's own ecotoxicologists continued raising concerns about PFAS until at least 1999.

147.    Despite decades of research, 3M first shared its concerns with the EPA in the late 1990s. In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information" according to a former 3M employee.

148.    Indeed, 3M's own employees were highly critical of 3M's management of PFAS risks. In March 1999, for example, 3M environmental scientist Rich Purdy wrote to 3M and

27

expressed his "profound disappointment" with "3M's handling of the environmental risks associated with the manufacture and use of" PFOS. Mr. Purdy described PFOS as "the most insidious pollutant since PCB," and that it is "probably more damaging than PCB because it does not degrade, whereas PCB does; it is more toxic to wildlife; and its sink in the environment appears to be biota and not soil and sediment, as is the case with PCB." Mr. Purdy described his attempts to discuss the dangers of the chemical with the company, and 3M's refusal to act. Finally, Mr. Purdy stated: "I can no longer participate in the process that 3M has established for the management of [PFAS.] For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."

149. Yet even as 3M phased out production of its PFAS Products in early 2000s because of pressure from the EPA, the company continued to publicly represent that those "products are safe." In stark contrast, the EPA stated in its press release regarding 3M's phase out of PFAS: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term." The EPA added that PFOS "appears to combine Persistence, Bioaccumulation, and Toxicity property to an extraordinary degree."

150. Even after 3M ceased manufacturing PFAS, it worked to control and distort the science on PFAS and their dangers to the environment and human health. For example, 3M provided millions of dollars in grants to a professor, John Giesy, who publicly presented himself as independent but behind the scenes worked for 3M. Mr. Giesy's goal, as expressed in a 2008 email, was to "keep 'bad' papers [regarding PFAS] out of the literature [because] otherwise in litigation situations they can be a large obstacle to refute."

28

151.    In fact, as recently as November 2018, 3M publicly stated that "the vast body of scientific evidence does not show that PFOS or PFOA cause adverse health effects in humans at current exposure levels, or even at the historically higher levels found in blood." And in 2019, 3M publicly claimed: "We do not believe that PFOS and PFOA cause harm to human health at levels that are typically found in the environment" and that "[w]e do not believe there is a public health issue related to PFOA and PFOS." These statements contradict decades of research demonstrating the serious health and environmental effects of PFAS, including internal studies conducted by 3M's own scientists.

152.    3M knew or should have known that the ordinary use of its PFAS Products would injure public health and the environment, including in the Town of Pittsboro.

### 2.    DUPONT

153.    Like 3M, DuPont has known for decades of the health and environmental risks posed by PFAS.

154.    In approximately 1951, DuPont started using PFOA to make Teflon at its Washington Works manufacturing plant in Parkersburg, West Virginia. As early as 1954, employees at that plant reported that C8 (another name for PFOA) might be toxic. DuPont was concerned enough about the complaints that it delayed marketing Teflon to the public. In 1961, seven years later, Teflon consumer products hit the marketplace.

155.    By 1961, DuPont's researchers had concluded that PFOA was toxic and DuPont's chief toxicologist, Dorothy Hood, warned in a memo to executives that products containing PFOA should be "handled with extreme care." As early as the 1960s, DuPont knew that PFOA caused adverse liver reactions in dogs and rats.

156.    By at least 1966, DuPont was aware that PFOA could leach into groundwater.

29

157. By 1976, DuPont knew about research showing detections of organic fluorine in blood bank samples in the United States, which the researchers thought could be a potential result of human exposure to PFOA.

158. By 1979, DuPont had data indicating that its workers who were exposed to PFOA had a significantly higher frequency of health issues compared to unexposed workers. However, DuPont did not report these data to any government agency or any community where it used PFOA.

159. By at least 1980, DuPont had internally confirmed that PFOA "is toxic," that "continued exposure [to PFOA] is not tolerable," and that people accumulate PFOA in their bodies.

160. By at least 1981, DuPont also knew that PFOA could be emitted into the air from its facilities, and that those air emissions could travel beyond the facility boundaries and enter the environment and natural resources.

161. No later than 1981, DuPont had also obtained a 3M internal study that had documented birth defects in the eyes of unborn rats exposed to PFOA in utero. Based on this research, DuPont urged its female workers who came into contact with PFOA to consult their doctors "prior to contemplating pregnancy."

162. Around this same time, a pregnant DuPont worker in the Teflon division of the Washington Works plant began moving PFOA waste into pits using a pump-like device as part of her job responsibilities. When the DuPont employee gave birth in January 1981, the baby had only half a nose and a ragged eyelid that gaped down to the middle of his cheek. This was consistent with the 3M study, and in March 1981, DuPont had a pathologist and a birth defects expert review the 3M study. They concluded that "the study was valid" and that "the observed fetal eye defects

30

were due to C8." DuPont immediately removed all female workers from areas where they might come into contact with PFOA.

163. In April 1981, DuPont began monitoring 50 female employees who had been exposed to PFOA. As DuPont's medical director Bruce Karrh explained in a memo, this monitoring was undertaken to "answer a single question—does C8 cause abnormal children?" Initial data showed that two of the seven pregnant workers exposed to PFOA had babies with eye and nostril deformities, which the researchers concluded was "statistically significant." DuPont abandoned the study rather than inform regulators or employees.

164. In a confidential November 1982 memo, DuPont's medical director warned about employees being exposed to potentially dangerous levels of PFOA. He recommended that all "available practical steps be taken to reduce this exposure."

165. By at least the mid-1980s, DuPont was aware that PFOA is bio-persistent and bio-accumulative.

166. DuPont was long aware it was releasing PFAS from its facilities that were leaching into groundwater used for public drinking. After obtaining data on these releases and the consequent contamination near DuPont facilities in West Virginia and Ohio, DuPont held a meeting in 1984 at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting"). DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials capable of eliminating additional PFOA releases from its operations. DuPont chose not to use either, despite knowing of PFOA's toxicity.

31

167.     During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability." They discussed DuPont's "incremental liability from this point on if we do nothing as we are already liable for the past 32 years of operation." They also stated that "legal and medical will likely take the position of total elimination" of PFOA use and had "no incentive to take any other position."

168.     As early as 1988, DuPont began treating PFOA internally as a possible human carcinogen.

169.     In 1999, DuPont received preliminary results from a monkey health study showing that C8 caused monkeys to lose weight and increased their liver size. Even monkeys given the lowest doses suffered liver enlargement, and one was so ill it had to be euthanized.

170.     An internal DuPont memorandum regarding its litigation strategy shows that DuPont sought to "not create [the] impression that DuPont did harm to the environment" and wanted to "keep [the] issue out of the press as much as possible."

171.     In 2000, John R. Bowman, a DuPont in-house counsel for C8 issues, wrote an email to several colleagues: "I think we need to make more of an effort to get [DuPont] to look into what we can do to get the Lubeck community a clean source of water or filter the C-8 out of the water." He continued:

> I think we are more vulnerable than the MTBE defendants [manufacturers of another dangerous groundwater contaminant, methyl tertiary-butyl ether] because many states have adopted a drinking water guideline for MTBE and it is not biopersistent. My gut tells me the biopersistence issue will kill us because of an overwhelming public attitude that anything biopersistent is harmful.

> We are going to spend millions to defend these lawsuits and have the additional threat of punitive damages hanging over our head. Getting out in front and acting responsibly can undercut and reduce the potential for punitives. [Bernard Reilly, another DuPont attorney] and I have been unsuccessful in even engaging the clients in any meaningful discussion of the subject. Our story is not a good one, we continued to increase our emissions into the [Ohio] river in spite of internal

commitments to reduce or eliminate the release of this chemical into the community and the environment because of our concern about the biopersistence of this chemical.

172. In a 2001 e-mail, DuPont in-house lawyer Bernard Reilly described DuPont's response to the C8 issue as "a debacle at best." Reflecting on a late 2001 meeting with EPA concerning PFAS contamination in Parkersburg, West Virginia, Reilly wrote of DuPont: "[T]he business did not want to deal with this issue in the 1990s, and now it is in their face, and some still are clueless. Very poor leadership, the worst I have seen in the face of a serious issue since I have been with DuPont."

173. Notwithstanding its internal knowledge of PFOA's health and environmental risks beginning as early as the 1950s, DuPont publicly stated in 2003 that "[w]e are confident that there are no health effects associated with C-8 exposure," and that "C-8 is not a human health issue."

174. DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's practice of stating publicly that there were no adverse health effects associated with human exposure to PFOA. In June 2005, DuPont reported to the press that "no human health effects are known to be caused by PFOA." An ERB member called that statement "[s]omewhere between misleading and disingenuous." In February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of DuPont's public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

175. Contrary to the ERB's advice, DuPont's chief medical officer issued a press release in October 2006, stating that "there are no health effects known to be caused by PFOA." An ERB member criticized the press release because it "appear[ed] written to leave the impression 'don't worry.'"

33

176.  DuPont knew or should have known that the ordinary use of its PFAS Products would injure public health and the environment in the Town.

### 3.  THE ADDITIONAL AFFF DEFENDANTS

177.  Chemguard, Tyco, Kidde, Kidde PLC, Chubb, UTC, Carrier, National Foam, Buckeye, Arkema, BASF, Clariant, AGC, AGC Americas, Dynax, Archroma, Archroma U.S., and Doe Defendants also knew—or at the very least should have known—that the ordinary and intended use of their PFAS Products would injure the natural environment and threaten public health in the Town.

178.  Chemguard, Tyco, Kidde, Kidde PLC, Chubb, UTC, Carrier, National Foam, Buckeye, Arkema, BASF, Clariant, AGC, AGC Americas, Dynax, Archroma, Archroma U.S., and Doe Defendants were all experts in the field of PFAS Products manufacturing and/or materials needed to manufacture PFAS Products.

179.  By virtue of that expertise, Chemguard, Tyco, Kidde, Kidde PLC, Chubb, UTC, Carrier, National Foam, Buckeye, Arkema, BASF, Clariant, AGC, AGC Americas, Dynax, Archroma, Archroma U.S., and Doe Defendants all had detailed information and understanding about the chemical compounds that form PFAS Products.

180.  As manufacturers and sellers of AFFF, and/or their components, ingredients, Chemguard, Tyco, Kidde, Kidde PLC, Chubb, UTC, Carrier, National Foam, Buckeye, Arkema, BASF, , Clariant, AGC, AGC Americas, Dynax, Archroma, Archroma U.S., and Doe Defendants and their predecessors all had ready access to substantial information about PFAS.

181.  This information was also accessible to all of Defendants as part of their ongoing involvement in various trade associations and groups formed for the purpose of defending their industry, products, and conduct.

182. One such group, the Firefighting Foam Coalition ("FFFC"), was formed in 2001 to dispel concerns the EPA had raised about AFFF's environmental viability. Many of the Defendants were members of the FFFC, including DuPont, Chemguard, Tyco, Kidde, National Foam, and Buckeye.

183. The FFFC was formed and designated by these Defendants and others to serve as a lobbying group on behalf of its members. In a meeting with key officials at the EPA on September 28, 2001, these Defendants made it clear that the FFFC would "represent the AFFF industry's interests on issues related to the environmental acceptability of fire fighting foams."

184. The FFFC repeatedly worked to cover up the risks associated with AFFF. For example, the FFFC stated in the September 2001 meeting with EPA officials that "telomer based AFFF [which the above-listed Defendants manufactured] does not contain PFOS and cannot be oxidized or metabolized into PFOS." The FFFC also publicly asserted that "telomer based fire fighting foams are not likely to be a source of PFOA in the environment." At the time it made these statements, however, the FFFC and its members were aware that AFFF contained PFOA or degrades into PFOA in the environment.

185. Through their involvement in the FFFC, as well as a variety of other trade associations and groups, Defendants shared knowledge and information regarding PFAS. They also worked together to protect AFFF and other PFAS Products from scrutiny and to shield the AFFF industry from the detrimental impact of the public and regulators learning about PFAS's harms to human health and the environment.

### E. DEFENDANTS FAILED TO ACT ON THEIR KNOWLEDGE OF THE HEALTH AND ENVIRONMENTAL RISKS OF PFAS.

186. Despite their knowledge that PFAS Products posed grave environmental and human health risks, and despite the availability of safer alternative products, Defendants failed to

35

warn customers, users, the public, and the Town about those risks, and they failed to take any other appropriate precautionary measures to prevent or mitigate PFAS contamination of the environment. Instead, Defendants falsely and misleadingly promoted PFAS Products as being environmentally sound and appropriate for widespread use.

187. At all times relevant to this litigation, Defendants were or should have been aware that PFAS contamination and injury to the Town's natural resources and property, and its residents' public health, were inevitable, due to the solubility of PFAS, the resistance to biodegradation and bioremediation, and the normal and foreseen use and disposal of PFAS in industrial processes, and in consumer, household, and commercial products manufactured, distributed, sold, and used in the Haw River watershed.

188. Defendants possess—and have always possessed—vastly superior knowledge, resources, experience, and other advantages, in comparison to any person or government entity, concerning the manufacture, distribution, nature, and properties of PFAS Products.

189. By virtue of their tremendous economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to the Town's natural resources and property, and its residents' health.

190. In addition, by virtue of this superior knowledge, and/or by virtue of Defendants' partial and incorrect statements regarding the nature and impacts of PFAS, Defendants had a duty to disclose the truth and to act in accordance with the truth about PFAS.

191. Defendants failed to take reasonable steps to eliminate or reduce the dangers posed by their PFAS Products. Instead, they concealed and misrepresented those dangers to the consumers, the public, and the Town.

36

## F. DEFENDANTS CAUSED PFAS CONTAMINATION IN THE TOWN AND THE HAW RIVER WATERSHED.

192. Defendants have caused PFAS contamination in the Town and the Haw River watershed upstream of the Town by designing, manufacturing, promoting, selling, distributing, using, and/or disposing of PFAS Products in locations where PFAS would migrate into the Town and the Haw River, which is the Town's source of drinking water; by failing to adequately investigate and test those PFAS Products to ensure that they would not cause harm to the public or the environment; by failing to adopt warnings, alternative product designs, or other measures that could have reduced or eliminated the known dangers of PFAS Products; and by concealing and misrepresenting the adverse health and environmental impacts of PFAS.

193. At all times relevant to this action, Defendants had superior knowledge of the dangers of PFAS to all other persons and concealed and/or failed to sufficiently disclose those dangers. Because of Defendants' superior knowledge and tortious conduct, the risks associated with PFAS were concealed from non-Defendant end users, owners, and operators of sites from which PFAS have been released and contaminated the Town and its water supply.

194. Because of Defendants' tortious conduct, the risks associated with PFAS were unknown to users and consumers of PFAS Products and were unknown to the Town until recently.

195. Defendants' PFAS Products are the major sources of PFAS contamination in the Town and its water supply. PFAS from these Products have contaminated Town property, including its drinking water system.

196. The Town is located on the Haw River, a major tributary of the Cape Fear River. The Town draws drinking water from a 2-million-gallons-per-day conventional water treatment facility with a run-of-river intake on the Haw River. The Town provides public water services to several thousand people.

37

197.     Surface water and groundwater systems in the Haw River watershed are fully integrated such that contaminated groundwater could enter the Haw River. The flow of the Haw River and its tributaries is comprised of direct runoff of precipitation, groundwater inflow, and discharge from anthropomorphic sources such as wastewater treatment facilities and irrigation runoff.

198.     The Haw River watershed encompasses all or part of eight counties and has been the site of widespread industrial activity.

199.     There are many cities and towns upstream of Pittsboro in the Haw River watershed that discharge treated wastewater into the Haw River or its tributaries. At times, treatment plant effluent constitutes over 50 percent of the Haw River's flow.

200.     PFAS have been detected at high levels in the effluent of wastewater treatment facilities that discharge into the Haw River upriver of Pittsboro.

201.     There are myriad potential contributors of PFAS to the Haw River. Likely sources of PFAS contamination from which the Town suffers include but are not limited to chemical manufacturing sites; chemical blending and repackaging sites; plastics manufacturers; semiconductor manufacturing sites; providers of plating, finishing, and coating services; manufacturers of PTFE products; airports; landfills; wastewater treatment facilities; and fire stations.

202.     PFAS contamination has been detected in the Haw River at the Town's intake. These levels have exceeded the interim health advisory levels for PFOA and PFOS adopted by the EPA in June 2022.

203.     Total PFAS concentrations in the Town's water supply have been sampled at levels that are among the highest in the state.

38

204.     Because Defendants' PFAS Products were used, and were required to be used, at airports throughout the country, PFAS have contaminated the Piedmont Triad International Airport. The Piedmont Triad International Airport is a significant source of PFAS contamination in the Haw River and the Town's water supply.

205.     Because the Town and the State of North Carolina recently learned about the dangers of PFAS, and because the Town and the State of North Carolina—as public entities—have limited resources, the Town has only recently started to address its PFAS problem. The Town established the Pittsboro Water Quality Task Force to respond to PFAS. The Town has also engaged consultants to evaluate water treatment options. The Town has installed a granular activated carbon filter system in its water system. However, the Town will continue to incur considerable expenses to address PFAS contamination.

## FIRST CAUSE OF ACTION

## PRODUCTS LIABILITY - DESIGN DEFECT

206.     Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

207.     Defendants, at all times relevant herein, were designers, manufacturers, marketers, sellers and/or distributors of PFAS Products.

208.     As designers, manufacturers, marketers, sellers and/or distributors of PFAS Products, Defendants owed a duty to all persons whom Defendants' PFAS Products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

209.     Defendants' PFAS Products were distributed, sold, and used in a manner intended and reasonably foreseen by Defendants, and reached consumers and the environment in a condition substantially unchanged from that in which they left Defendants' control.

39

210. Plaintiff was harmed by PFAS Products that were designed, manufactured, marketed, sold and/or distributed by Defendants, and which were defectively designed; did not include sufficient instructions; and did not include sufficient warning of potential safety, environmental, and health hazards.

211. Defendants' PFAS Products did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way.

212. Defendants' PFAS Products were defective in that they were not fit for the intended use for which they were sold and were unreasonably dangerous. Defendants' PFAS Products were defective at the time they were in Defendants' control.

213. Defendants represented, asserted, claimed and/or warranted that their PFAS Products could be used in conformity with accompanying instructions and labels in a manner that would not cause injury or damage.

214. PFAS Defendants' PFAS Products were used on and/or in the vicinity of Plaintiff's property in a reasonably foreseeable manner and without substantial change in the condition in which they were sold.

215. Defendants knew, or should have known, that use of Defendants' PFAS Products in their intended manner would result in the spillage, discharge, disposal, or release of PFAS into the surface water, soil, and groundwater.

216. Furthermore, Defendants knew, or should have known, that their PFAS Products are toxic, could not be contained, are persistent, and do not readily degrade in the environment.

217. Defendants, with knowledge of the risks, failed to use reasonable care in the design of their PFAS Products.

218.     Plaintiff was, is, and will continue to be harmed by Defendants' defectively designed PFAS Products.

219.     Defendants' conduct, as set forth herein, was a substantial factor in causing Plaintiff's harm.

220.     Because PFAS contamination is widespread, persistent, and toxic, the gravity of the environmental harm resulting from Defendants' PFAS Products was, is, and will significantly outweigh the Products' benefit, and outweigh the cost of precautions that Defendants could have taken to reduce that risk.

221.     The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that Defendants' PFAS Products were toxic, could not be contained, and do not readily degrade in the environment.

222.     At the time of manufacture, there were safer alternative designs available to Defendants that were feasible, cost effective, and advantageous, and Defendants unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design that could have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

223.     As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property, including its drinking water system. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

41

224. Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages.

## SECOND CAUSE OF ACTION

## PRODUCTS LIABILITY – FAILURE TO WARN

225. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

226. Defendants, at all times relevant herein, were designers, manufacturers, marketers, sellers and/or distributors of PFAS Products.

227. As manufacturers, distributors, suppliers, sellers, and marketers of PFAS Products, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risks posed by PFAS.

228. Defendants' PFAS Products did not perform as safely as an ordinary consumer would have expected them to perform when used in an intended or reasonably foreseeable way.

229. Defendants' PFAS Products were defective in that they were not fit for the intended use for which they were sold and were unreasonably dangerous. Defendants' PFAS Products were defective at the time they were in Defendants' control. At the time Defendants' PFAS products left the control of Defendants, those products created an unreasonably dangerous condition that Defendants knew or should have known posed a substantial risk of harm to the Town and others.

230. Defendants knew that their PFAS Products would be purchased, transported, stored, handled, and used without notice of the hazards that PFAS pose to human health and the environment.

231. Defendants knew, or should have known, that use of Defendants' PFAS Products in their intended manner would result in the release of PFAS into the surface water, soil, and groundwater.

42

232.     Defendants breached their duty to warn by unreasonably failing to provide Plaintiff, public officials, purchasers, downstream handlers, and/or the general public with warnings about the potential and/or actual contamination of the environment by PFAS, despite Defendants' knowledge that PFAS were real and potential threats to human health and the environment.

233.     PFAS Products purchased or otherwise acquired from Defendants were used, discharged, and/or released at and/or in the vicinity of Plaintiff's property and the Haw River watershed.

234.     Defendants' PFAS Products were used in a reasonably foreseeable manner and without substantial changes in the condition in which the Products were sold.

235.     Defendants' PFAS Products used on and/or in the vicinity of Plaintiff's property and the Haw River watershed were defective in design and unreasonably dangerous for the reasons set forth above.

236.     Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of Defendants' PFAS Products on or near Plaintiff's property, including contamination of Plaintiff's property and water supply with PFAS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

237.     In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFAS Products.

238.     If Defendants had provided adequate warnings and/or precautionary statements regarding their PFAS Products, customers, users, handlers, and/or disposers of those PFAS Products would have heeded those warnings and/or precautionary statements, reducing or eliminating the Town's injuries.

43

239. The dangers of Defendants' PFAS Products were not open and obvious or a matter of common knowledge.

240. As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property, including its drinking water system. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

241. Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages.

## THIRD CAUSE OF ACTION

### PUBLIC NUISANCE

242. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

243. Defendants designed, manufactured, distributed, marketed, and/or sold their PFAS Products in a manner that created, or participated in creating, a nuisance consisting of PFAS contamination of the Haw River watershed including the Town and its drinking water, the Haw River's surface water, and groundwater hydrologically linked to the Haw River.

244. This nuisance significantly interferes with the property, health, safety, peace, and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

245. Defendants, by their negligent, reckless and willful acts and omissions set forth above have, among other things, knowingly unleashed long-lasting and ongoing PFAS contamination and threat of contamination to Plaintiff's property.

44

246. Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

247. The nuisance that Defendants have inflicted upon Plaintiff is substantial and unreasonable, and Defendants inflicted it in an intentional, reckless, or negligent manner.

248. In addition or alternatively, the nuisance that Defendants have inflicted upon Plaintiff arises from Defendants' abnormally dangerous conduct.

249. Defendants' conduct has also injured, and continues to injure, the property, health, safety, and/or comfort of a considerable number of persons.

250. Defendants knew or, in the exercise of reasonable care, should have known that the use and introduction of their PFAS Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's property by Plaintiff.

251. As a riparian water user and a municipality responsible for delivering safe drinking water to thousands of residents, Plaintiff has suffered special and unique injuries caused by Defendants' conduct.

252. As a direct and proximate result of Defendants' above-described acts and omissions that caused the nuisance, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property and drinking water supply. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

45

253. The relief requested by Plaintiff will remedy Plaintiff's special and unique injuries.

254. Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages. Plaintiff also requests injunctive relief to abate the nuisance.

**FOURTH CAUSE OF ACTION**

**PRIVATE NUISANCE**

255. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

256. Defendants designed, manufactured, distributed, marketed, and/or sold their PFAS Products in a manner that created, or participated in creating, a nuisance that causes inconvenience, annoyance, and injury to Plaintiff's property, including its drinking water system.

257. Defendants, by their negligent, reckless and willful acts and omissions set forth above have, among other things, knowingly caused PFAS contamination of Plaintiff's property, as well as a long-lasting and ongoing threat of further PFAS contamination of Plaintiff's property.

258. Actual and threatened PFAS contamination caused by Defendants' conduct has caused, and continues to cause, injury to Plaintiff in the form of present and serious interference with the use, benefit, and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

259. The nuisance that Defendants have inflicted upon Plaintiff is substantial, unreasonable, and intentional, reckless, or negligent, and arises from Defendants' abnormally dangerous conduct.

260. The nuisance that Defendants have inflicted upon Plaintiff is unreasonable, such that a person of ordinary prudence and discretion would consider it excessive or inappropriate after

46

giving due consideration to the interest of Plaintiff, the interest of the Defendants, and the interest of the community.

261.    Defendants knew, or in the exercise of reasonable care should have known, that the use and introduction of their PFAS Products into the environment would and has continuously, unreasonably and seriously endangered and interfered with the ordinary safety, use, benefit, and enjoyment of Plaintiff's property by Plaintiff.

262.    Defendants' above-described acts and omissions have caused and are causing a substantial and unreasonable interference with Plaintiff's use and enjoyment of its property. As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property and drinking water system. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

263.    Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages. Plaintiff also requests injunctive relief to abate the nuisance.

## FIFTH CAUSE OF ACTION

### TRESPASS

264.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

265.    Plaintiff is the owner and/or actual possessor of Plaintiff's property, including its drinking water system, and other relevant structures located thereon. Defendants knew, or in the

47

exercise of reasonable care should have known, that PFAS contaminates soil, surface water, and groundwater, including the property and other rights of Plaintiff.

266. Defendants failed to properly warn against the use of PFAS Products, in light of PFAS Products' unique characteristics and ability to contaminate, such that they intentionally and proximately caused and continue to cause PFAS to contaminate Plaintiff's property, including but not limited to Plaintiff's water system.

267. The contamination of Plaintiff's property has varied over time and is ongoing. PFAS continue to migrate onto and enter Plaintiff's property. The contamination is reasonably abatable.

268. Defendants have no right or privilege to so infringe on Plaintiff's property. Defendants' infringement on Plaintiff's property was and is unauthorized.

269. Plaintiff has not consented to, and does not consent to, this trespass or contamination.

270. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

271. Plaintiff was, is, and will continue to be harmed by the entry of Defendants' PFAS Products onto and/or into its property.

272. As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property, including but not limited to its drinking water system. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

48

273. Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages. Plaintiff also requests injunctive relief to abate the trespass.

## SIXTH CAUSE OF ACTION

### NEGLIGENCE

274. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

275. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, and/or handlers of PFAS Products, Defendants owed a duty to Plaintiff, as well as to all persons whom Defendants' PFAS Products might foreseeably harm, to exercise due care in the instructing, labeling, and warning of the handling, control, use, and disposal of Defendants' PFAS Products.

276. Despite the fact that Defendants knew that PFAS are toxic, can contaminate soil and water resources, and present significant risks to human health and the environment, Defendants negligently: (a) designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold PFAS Products; (b) issued instructions on how PFAS Products should be used and disposed of, thus improperly permitting PFAS to enter and contaminate Plaintiff's property, water supply, and drinking water system; (c) failed to warn the users of PFAS Products of the dangers of soil and water contamination as a result of standard use and disposal of these products; and (d) failed and refused to issue the appropriate warnings to the users of PFAS Products regarding the proper use and disposal of these products, notwithstanding the fact that Defendants knew, or could determine with reasonable certainty, the identity of the purchasers of their PFAS Products.

49

277.   A reasonable manufacturer, seller, or distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of PFAS Products.

278.   Defendants' conduct, as set forth above, was a substantial factor in causing Plaintiff's harm.

279.   Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment. Defendants' conduct was wanton and done with conscious or reckless disregard for the rights and safety of others, and thus Defendants were grossly negligent.

280.   As a direct and proximate result of Defendants' above-described acts and omissions, Plaintiff has incurred, continues to incur, and/or will incur costs and damages related to the PFAS contamination of its property and drinking water system. The costs and damages include but are not limited to the investigation, monitoring, treatment, testing, remediation, removal, and/or disposal of the PFAS contamination; operating, maintenance and consulting costs; legal fees; and diminished property value.

281.   Additionally, because Defendants acted in a willful or wanton fashion and/or with malice, Plaintiff is entitled to punitive damages.

## REQUEST FOR RELIEF

Plaintiff Town of Pittsboro respectfully asks this Court for judgement against Defendants, jointly and severally, and to award the Town:

a.   Compensatory damages in an amount according to proof, including the administrative and response costs the Town has incurred;

b.   Loss-of-use damages;

c.   Natural resource damages;

d.   Punitive damages in an amount to be determined at trial;

50

e. Injunctive and equitable relief, including but not limited to a fund to abate harms to the Town;

f. All appropriate declaratory relief;

g. Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

h. Pre-judgment interest and post-judgment interest; and

i. All other relief this Court deems just, proper, and equitable.

Dated: January 25, 2023

Respectfully submitted,

PAUL S. MESSICK, JR.
pm@gunnmessick.com
**GUNN & MESSICK, PLLC**
P.O. Box 880 (90 W. Salisbury Street)
Pittsboro, NC 27312
(919) 542-3253

VICTOR M. SHER (*pro hac vice* forthcoming)
vic@sheredling.com
MATTHEW K. EDLING (*pro hac vice* forthcoming)
matt@sheredling.com
STEPHANIE D. BIEHL (*pro hac vice* forthcoming)
stephanie@sheredling.com
ASHLEY B. CAMPBELL (*pro hac vice* forthcoming)
ashley@sheredling.com
PAUL STEPHAN (*pro hac vice* forthcoming)
paul@sheredling.com
YUMEHIKO HOSHIJIMA (*pro hac vice* forthcoming)
yumehiko@sheredling.com
**SHER EDLING LLP**
100 Montgomery St. Suite 1410
San Francisco, CA 94104
(628) 231-2500

Attorneys for Plaintiff Town of Pittsboro

51